CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 1 2 2018

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

BRIAN FARABEE,  )  Civil Action No. 7:16-cv-00325
　　Plaintiff,  )
　　　　　　　  )
v.  )  **MEMORANDUM OPINION**
　　　　　　　  )
HAROLD CLARKE, et al.,  )  By:　Hon. Michael F. Urbanski
　　Defendants.  )  　　　Chief United States District Judge

Brian Farabee, a Virginia inmate proceeding pro se, commenced this civil rights action

pursuant to 42 U.S.C. §§ 1983 and 12101, et seq., and 29 U.S.C. § 794. Plaintiff argues that the

conditions of his confinement in several correctional facilities between March 2016 and January

2017 violated the United States Constitution, the Americans with Disabilities Act ("ADA"), and

the Rehabilitation Act of 1973.[1] Plaintiff names as defendants: the Virginia Department of

Corrections ("VDOC"); Harold Clarke, the Director of the VDOC; A. David Robinson, the

VDOC's Chief of Corrections Operations; Dara F. Robichaux-Watson, the Warden of Marion

Correctional Treatment Center ("Marion"); Dr. James A. Lee, Plaintiff's primary treating

psychiatrist at Marion; Dr. Cary, the Chief Psychiatrist at Marion; and Eric Madsen, a

psychologist for the VDOC. Defendants filed a motion for summary judgment, arguing, inter

alia, the defense of qualified immunity. Plaintiff filed two timely responses (ECF Nos. 85, 97),

making this matter ripe for disposition.[2] After reviewing the record, the court grants in part and

---

[1] Plaintiff commenced this action no earlier than June 30, 2016, and the second amended complaint was filed no earlier than January 30, 2017.

[2] Several docket issues need to be addressed. In addition to his first memorandum in opposition, Plaintiff also filed a motion to correct the record, noting that he accidentally filed a document in another case that was meant for this case. Finding it appropriate to do so, the motion to correct the record is granted, and the court considers the timely, misfiled document (ECF No. 97) for this action only.

Plaintiff filed responses both within and beyond the time to do so. The court had granted Plaintiff the opportunity to respond to the motion for summary judgment by May 24, 2017. In accordance with his pro se status and the prison mailbox rule, the court will consider two of Plaintiff's submissions filed before the deadline: the misfiled memorandum (ECF No. 97) and the first timely memorandum in opposition (ECF No. 85), which includes exhibits T through Z-6 and references exhibits A through S filed at docket entry 69. Plaintiff filed two other

denies in part Defendants' motion for summary judgment and directs Defendants to file another motion for summary judgment.

I.
A.

Plaintiff suffers from mental illnesses, including Borderline Personality Disorder. A psychiatrist testified about that disorder in 2013 during one of Plaintiff's criminal proceedings. She described the disorder as:

> [C]haracterized by impulsivity, interpreting the interactions of others as being . . . negative towards them. . . . [and] an inability to effectively manage distressing thoughts, feelings and situations. . . . [W]hen distressed and unable to cope with this effectively, they tend to engage in threats against self or others, self-harm or aggression towards others. Their mood also tends to be . . . ranging from periods of being calm to fits of rage and screaming and irritability. Dialectical Behavior Therapy [("DBT")] is a modality of treatment specifically developed for borderline personality disorder, and this treatment teaches individuals how to cope better with a distressing situation. . . . Unfortunately, people with borderline personality disorder do not have the same . . . ways of coping with . . . distressful situations. . . . DBT . . . provides some additional tools for dealing with these distressful situations so the[ir] default is not engaging in self-harm or acting out towards others.

---

responses, one of which is an unsigned "affidavit," long after the deadline passed, and he has not moved for an extension of time pursuant to Fed. R. Civ. P. 6(b)(1)(B). The Supreme Court has made clear that even pro se litigants must follow rules of civil procedure. McNeil v. United States, 508 U.S. 106, 113 (1980); see Cichon v. Exelon Generation Co., L.L.C., 401 F.3d 803, 809-10 (7th Cir. 2005) (recognizing a district court may ignore and not consider additional facts a litigant proposes in violation of court orders or rules of procedure). Furthermore, Plaintiff cannot use a response to a motion for summary judgment to amend or correct the complaint challenged by the motion for summary judgment. Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009). Accordingly, the court will not consider Plaintiff's untimely responses to the motion for summary judgment, and to the extent those documents present new claims that accrued after the second amended complaint, he is free to file those claims in a new and separate action.

Lastly, the Clerk docketed several documents filed by a non-party who may not file documents on Plaintiff's behalf. See 28 U.S.C. § 1654 (noting only parties or parties' attorneys may plead and conduct their own cases in federal courts). Accordingly, those documents (ECF Nos. 89, 91) are stricken from the public docket and are not considered.

Plaintiff was found Not Guilty by Reason of Insanity ("NGRI") in 1999 for a fire he started inside Eastern State Hospital. A licensed clinical psychologist wrote a report after evaluating Plaintiff, noting presciently:

> Mr. Farabee may well meet legal criteria for a[] [Not Guilty By Reason of Insanity] defense. Given that, please allow the following advice. To hospitalize this patient until he is deemed "stable" may well result in a life sentence to a psychiatric hospital. . . . [L]ong-term placement in institutional settings virtually never prove useful for treatment of borderline personality disorder. In almost all cases, the frequency and intensity of self-destructive behavior worsens. Furthermore, emotional dependency on persons within the institution tends to lead patients to sabotage discharge efforts (despite their repeated claims of wanting discharge). I should also point out that pharmacological interventions have no proven utility for this disorder. Their benefit usually stems from sedative side effects (as a sleeping or sleepy patient is less likely to act-out). . . .
>
> Clinically, Mr. Farabee requires much more intensive and sophisticated therapy for childhood abuse/neglect issues than he is currently receiving. . . . Bluntly, he is quite unlikely to find such therapy within a state hospital. This patient needs a much more aggressive and motivated plan to assist his transition back to the community. Such a plan should include community day services, daily <u>outpatient</u> counseling, respite services, transitional living placement and financial assistance. . . . Hospital stays, when necessary for self-mutilation, should be brief and not endure beyond one day. Furthermore, for a period of several months, he should be allowed to reenter the hospital (again for only a brief period) without the requirement of first being destructive to self or others. It is the latter contingency that often forces borderline patients to commit acts of self-mutilation that otherwise would not occur.

Plaintiff was charged with malicious wounding while civilly committed in the custody of Virginia's Department of Behavioral Health and Developmental Services ("Department of Behavioral Health"). In 2000, the Circuit Court of Dinwiddie County convicted Plaintiff of two counts of malicious wounding and sentenced him to 20 years imprisonment within the VDOC. However, that court suspended 16 years and 8 months of the sentence with the condition Plaintiff

"keep the peace and be of good behavior and violate none of the penal laws of the Commonwealth or any other jurisdiction for . . . [t]wenty years."

Fifteen years after the sentencing, however, the Circuit Court of Dinwiddie County found Plaintiff guilty of violating this condition of probation due to a conviction in 2002 for fighting an allegedly armed inmate at Sussex I State Prison. The state court sentenced Plaintiff to serve six years and eight months in the custody of the VDOC, and it re-suspended a ten year term of incarceration with the same "good behavior" condition. Plaintiff remains incarcerated within the VDOC for this most recent conviction and sentence, and it is during this term of incarceration the instant claims arise.

## B.

Although they overlap one another and overlap defendants, the court separates the issues presented in the amended complaint into six claims.

First, Plaintiff alleges that Defendants denied him "constitutionally adequate treatment" under the Fourteenth Amendment and "unnecessarily restrain[ed]" him. Plaintiff uses the term "restraints" to represent the isolation he experienced in segregation and being forcibly medicated.

Second, Plaintiff alleges that, by his incarceration in the VDOC, Defendants denied him the "right to freedom of association" with "non-institutionalized persons of his choosing guaranteed by the [Fir]st Amendment." Plaintiff further alleges that this right was denied without due process guaranteed by the Fourteenth Amendment.

Third, Plaintiff alleges that defendant Dr. Cary unlawfully seized him with unnecessary bodily restraint by authorizing a standing order to allow staff to forcibly medicate him. Plaintiff

asserts that Dr. Cary's standing order: was improper for not first attempting less drastic alternatives, was contrary to Plaintiff's Authorized Representative's objection, was contrary to a different physician's recommendation made years earlier, violated Plaintiff's Advanced Medical Directive, and substantially deviated from professional norms. Thus, Plaintiff concludes that Dr. Cary's standing order violated the Fourteenth Amendment.[3]

Fourth, Plaintiff alleges that Defendants unlawfully seized and unlawfully imprisoned him in the VDOC and in violation of a state court order committing him to the custody of the Department of Behavioral Health. Plaintiff clarifies that he seeks a writ of habeas corpus and release from the VDOC due to perceived defects in the legal process that led to his current incarceration in the VDOC.

Fifth, Plaintiff alleges that Dr. Lee and Warden Robichaux-Watson retaliated against him with unnecessary bodily restraint. These defendants allegedly told Plaintiff how they would keep Plaintiff in segregation at Marion for commencing this lawsuit against Dr. Cary. Plaintiff explains that segregated housing at Marion means he has almost no contact with other people while confined in a cell twenty-three hours per day on weekdays and twenty-four hours per day on weekends, is exposed to lighting twenty-four hours a day, and may not access a telephone, a radio, a television, and recreation equipment. Plaintiff explains that being housed in segregation without mental health treatment exacerbates his mental illnesses and causes him to be suicidal.

Sixth, Plaintiff alleges that Defendants discriminate and violate the ADA and Rehabilitation Act by keeping him incarcerated in the VDOC instead of being housed and treated

---

[3] Plaintiff also couches this claim against Dr. Cary under the Fourth Amendment, but such a claim is frivolous given the circumstances how Plaintiff arrived at Marion per court orders. See discussion infra Sections I.C-E; see, e.g., Villanova v. Abrams, 972 F.2d 792, 795 (7th Cir. 1992). Furthermore, Plaintiff does not establish how Dr. Cary was involved in that state court process.

in a civil hospital operated by the Department of Behavioral Health. Plaintiff seeks a transfer to a civil hospital.

## C.

Plaintiff's complaints about prison life begin at Wallens Ridge State Prison ("Wallens Ridge"). Prison staff had Plaintiff confined in five-point restraints intermittently between March 22 and April 5, 2016, because of his self-harming behaviors.[4] One example of Plaintiff's often repeated threat is tearing open a surgical scar and pulling out his intestines.[5] Plaintiff refused to discuss treatment with a Qualified Mental Health Professional on April 2 and 3, claimed to have swallowed pieces of a razor, and continued his threats to self-injure.

Staff felt they were unable to treat Plaintiff at Wallens Ridge due to his acts and threats of self-harm and refusals for treatment. Consequently, prison staff petitioned the Wise County General District Court, in accordance with Virginia Code § 53.1-40.2 and VDOC policy, to have Plaintiff committed to Marion for acute treatment to stabilize his behavior.[6] The Wise County General District Court approved the petition on April 5, 2016, for "as needed" involuntary "medical and/or mental health care" for up to 180 days.

Plaintiff alleges that Dr. Cary threatened him at Wallens Ridge in March 2016. Dr. Cary allegedly told Plaintiff "she would have [him] forcibly drugged, although [he] informed her . . . of [his] Advanced Directive and L[egally] A[uthorized] R[epresentative] legally prohibiting

---

[4] Staff placed him in five-point restraints on March 25 because Plaintiff injured himself and refused to stop. Plaintiff was released from the five-point restraints the next day, but Plaintiff was returned to five-point restraints on March 28 after resuming self-injury. Plaintiff was released from five-point restraints two days later but again placed back in five-point restraints on April 1.

[5] The surgical scar may have been related to his suicide attempt in 2012 when he swallowed a spoon at Marion.

[6] Marion is the VDOC's psychiatric facility for treating adult male inmates who experience symptoms of a mental disorder and is accredited by the Joint Commission on Accreditation of Healthcare Organizations.

such." Plaintiff allegedly explained to Dr. Cary that he prefers treatment that includes access to the outdoors, release from isolation, a gym, and naturopathic remedies.[7]

### D.

Plaintiff alleges that Dr. Cary carried out her threat to forcibly drug him after he was transferred to Marion. Plaintiff was at Marion between April 6 and June 22, 2016. Acute Care inmates, like Plaintiff, are involuntarily committed to Marion for court-ordered treatment.[8] Each inmate is assigned to a treatment team usually consisting of a psychiatrist, a psychology associate, a licensed clinical social worker, a casework counselor, a recreation therapist, and a registered nurse.

> The Treatment Team is responsible for developing treatment plans, assuring implementation of treatment plan interventions, reassessing treatment plans at established intervals, and monitoring an inmate's progression. The Treatment Team will assess mental health needs and within fifteen (15) days will develop a Treatment Plan with each offender that will address major mental health needs. Treatment services and interventions include medication, therapeutic programs, individual counseling, educational services, wing meetings, work programs, and a therapeutic environment. Special interventions such as use of seclusion and/or restraints may be ordered by a Psychiatrist when an [inmate] needs protection from self harm and/or to prevent harm to others.

Plaintiff asserts that Dr. Cary "specifically directed nursing at [Marion] . . . to forcibly medicate him and to keep him in constant isolation in segregation." Plaintiff allegedly experienced "severe side effects . . . including but not limited to, fear, humiliation, pain, soreness, bleeding, dry mouth, dizziness, tremors, . . . inability to sit still[], blurred vision, muscle ache, drowsiness, etc."

---

[7] These alternatives allegedly include vitamins, "Omega 3's," and chamomile.
[8] Marion's "Acute Care Treatment Program" is licensed by the Department of Behavioral Health.

Haloperidol ("Haldol") was allegedly forcibly administered to Plaintiff four times in April 2016.[9] Staff first forcibly injected Haldol into Plaintiff on April 7, 2016. Staff next forcibly medicated him on April 14, 2016.[10] The last two times occurred on April 23, 2016, when a nurse gave him an oral dose of Haldol and staff forcibly injected Haldol and a narcotic tranquilizer.

Dr. Cary avers that Haldol is a common, safe, and effective treatment for "agitation" resulting from Borderline Personality Disorder. Dr. Cary explains that Haldol is a "typical" or "first-generation antipsychotic" and is approved by the Federal Drug Administration for oral or intramuscular use. Plaintiff denies being agitated or disruptive before each administration of Haldol.

In contrast, Plaintiff cites a document purportedly issued by the National Institute of Mental Health suggesting that "[o]nly a few studies show that medications are necessary or effective for people with [Borderline Personality Disorder]." The document notes that "[w]hile medications may be helpful in managing specific symptoms . . . . [like] aggression . . . . there is little evidence that this practice is necessary or effective."

### E.

Plaintiff was transferred from Marion to Red Onion State Prison ("Red Onion") on June 22, 2016. Soon after arriving, Plaintiff's resumed the familiar pattern of refusing treatment and threatening and acting to self-harm. For example, Plaintiff tried to open wounds by cutting and

---

[9] Also, an order for Haldol was entered in Plaintiff's medical record upon his re-admission to Marion in September 2016.
[10] Plaintiff does not specifically name the medication, but for purposes of summary judgment, the court infers that it was Haldol based on Plaintiff's recitation of allegations.

8

biting himself, and he refused to stop, refused medications, and threatened to put feces and urine in his wounds to force administrators to transfer him out of Red Onion.

Staff felt they were unable to treat Plaintiff at Red Onion due to his acts and threats of self-harm and refusals for treatment. On September 23, 2016, staff at Red Onion petitioned a state court to have Plaintiff committed to Marion for acute treatment to stabilize his behavior. The state court approved the request for "as needed" involuntary "medical and/or mental health care" for up to 180 days.

Plaintiff was transferred back to Marion on September 26, 2016.[11] Plaintiff remained noncompliant at Marion and received a few disciplinary convictions by January 30, 2017, when he filed the amended complaint.[12]

## II.

Defendants filed a motion for summary judgment, arguing, inter alia, the defense of qualified immunity. A party is entitled to summary judgment if the pleadings, the disclosed materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); see Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (recognizing a party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant). "Material facts" are those facts necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if, in viewing the record and all reasonable

---

[11] Plaintiff is currently confined at Red Onion.
[12] Plaintiff was convicted of two charges for failing to follow institutional count procedures or interfering with count, which resulted in the cumulative loss of sixty days' recreation. Plaintiff had three more serious convictions for threatening bodily harm and tampering with security materials, devices, or equipment, which resulted in the cumulative penalty of fifty days' segregation.

inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. Id. at 322-24. Summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248.

Even if there is no dispute as to the evidentiary facts, summary judgment is not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991). A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995). Instead, a court accepts as true the evidence of the non-moving party and resolves all internal conflicts and inferences in the non-moving party's favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). Also, a plaintiff cannot use a response to a motion for summary judgment to amend or correct a complaint challenged by the motion for summary judgment. Cloaninger, 555 F.3d at 336.

Qualified immunity permits "government officials performing discretionary functions . . . [to be] shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Because qualified immunity serves as an immunity from pretrial matters like discovery, the court finds it proper to first consider Defendants' defense of qualified immunity at the earliest opportunity and before addressing other affirmative defenses that may require discovery. Consequently, the court defers disposition of Defendants' exhaustion defense per 42 U.S.C. § 1997e(a) until after qualified immunity is resolved.

## III.

Defendants are entitled to qualified immunity and summary judgment for the second, fourth, and sixth claims. The second claim asserts that Plaintiff's imprisonment in the VDOC unlawfully frustrates his ability to associate with "non-institutionalized persons." The fourth claim asserts that a writ of habeas corpus should compel his release from the VDOC and into the custody of the Department of Behavioral Health. The sixth claim similarly asserts that Defendants violate the ADA and Rehabilitation Act by keeping him incarcerated in the VDOC instead of at a civil hospital of the Department of Behavioral Health. The remedy sought for these claims are the same: issuance of a habeas petition to return him to the Department of Behavioral Health.

Each of these claims ultimately concern a matter outside Defendants' control: the state court order confining Plaintiff to the VDOC. Even though Plaintiff would rather spend his time in a civil hospital operated by the Department of Behavioral Health, a § 1983 action is not the

proper procedural vehicle to hasten his release from the VDOC and be returned to the

Department of Behavioral Health. See, e.g., Nelson v. Campbell, 541 U.S. 637, 643, 646 (2004)

(recognizing the distinction between claims and remedies allowed under § 1983 versus habeas

petitions). To accelerate Plaintiff's release from the VDOC and back to the civil commitment of

the Department of Behavioral Health would be as improper as freeing any other state inmate

from lawfully-imposed imprisonment absent "favorable termination." See Heck v. Humphrey,

512 U.S. 477, 486-88 (1994) (stating that a § 1983 claim that would necessarily demonstrate the

invalidity of confinement or its duration should be brought as a habeas claim); see also Edwards

v. Balisok, 520 U.S. 641, 645-47 (1997) (stating that a § 1983 damages claim arguing that due

process rights violations resulted in loss of good-time credits should be brought as habeas corpus

petition); Preiser v. Rodriguez, 411 U.S. 475, 500 (1973) (stating that a writ of habeas corpus is

sole federal remedy when inmate challenges fact or duration of imprisonment and relief sought is

finding that the inmate is entitled to a speedier release). The simple allegation that confinement

in the VDOC frustrates his ability to associate with "non-institutionalized persons" merely

describes a condition that is "part of the penalty that criminal offenders pay for their offenses

against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

Thus, claims two, four, and six pursue indisputably meritless legal theories of relief and

are not actionable against Defendants via this lawsuit.[13] See, e.g., Neitzke v. Williams, 490 U.S.

319, 327 (1989). Accordingly, Defendants' motion for summary judgment is granted as to

claims two, four, and six.

---

[13] While the VDOC is subject to the ADA and the Rehabilitation Act, the VDOC is not a proper defendant for purposes of § 1983. See, e.g., 29 U.S.C. § 794(b)(1); 42 U.S.C. § 12131(1); Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989). Accordingly, the VDOC is no longer subject to the remaining § 1983 claims.

## IV.

The remaining first and third claims concern the conditions of confinement Plaintiff experienced at Wallens Ridge, Red Onion, and Marion. For the first claim, Plaintiff alleges that Defendants collectively denied him "constitutionally adequate treatment," "unnecessarily" kept him in segregation, and "unnecessarily" medicated him. For the third claim, Plaintiff specifically alleges that Dr. Cary "unlawfully seized" him with "unnecessary bodily restraint" by authorizing staff to medicate him. The court will discuss the third claim and part of the first claim about the involuntary administration of an antipsychotic drug before addressing the remaining conditions of confinement claims presented in the first claim.

### A.

The challenges to medication present two distinct arguments: a violation of the Fourteenth Amendment for the involuntary use of an antipsychotic drug and a violation of the Eighth Amendment for risking an allergic reaction by using Haldol. Plaintiff splits these challenges against Dr. Cary specifically and again to all other defendants generally. For the following reasons, all defendants but Dr. Cary and Dr. Lee are entitled to qualified immunity and summary judgment for these medication claims.

1. Involuntary use of an antipsychotic drug as to Dr. Cary

"[T]he forcible administration of antipsychotic drugs presents a sufficiently analogous intrusion upon bodily security to give rise to such a protectible liberty interest." Johnson v. Silvers, 742 F.2d 823, 825 (4th Cir. 1984). Consequently, an inmate has both substantive and procedural rights under the Fourteenth Amendment's Due Process Clause to avoid the unwanted administration of antipsychotic drugs. Substantively, "the Due Process Clause permits the State

to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." Washington v. Harper, 494 U.S. 210, 227 (1990). Procedurally, the Due Process Clause requires that the decision to forcibly medicate not be arbitrary or capricious. United States v. Charters, 863 F.2d 302, 306 (4th Cir. 1988). The person making this medical decision must exercise "professional judgment," meaning:

> [T]he decision may be based upon accepted medical practices in diagnosis, treatment and prognosis, with the aid of such technical tools and consultative techniques as are appropriate in the profession. Without attempting a definitive checklist, it is obvious that a decision of the type here in issue should involve consideration of such factors as the patient's general history and present condition, the specific need for the medication, its possible side-effects, any previous reaction to the same or comparable medication, the prognosis, the duration of any previous medication, etc.

Id. at 312 (citation omitted).

For purposes of due process, a medical decision to forcibly administer an antipsychotic drug is "presumptively valid [and] liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Youngberg v. Romeo, 457 U.S. 307, 323 (1982). An administrative adversarial hearing is not required before determining acceptable professional judgment.[14] Parham v. J.R., 442 U.S. 584, 608 (1979).

---

[14] Plaintiff was committed to Marion after an adversarial hearing in state court. Plaintiff does not challenge those legal proceedings, and this court has previously held that Virginia's relevant statutes comport with due process. Washington v. Silber, 805 F. Supp. 379, 384-85 (W.D. Va. 1992) (Wilson, J.), aff'd, No. 92-7199, 1993 U.S. App. LEXIS 13046, 1993 WL 188309 (4th Cir. 1993); see, e.g., Washington v. Harper, 494 U.S. 210, 220 (1990) (discussing the overlap of state protections and the Due Process Clause).

It is not clear who ordered the antipsychotic drug in April 2016, either as a monthly "maintenance" dose or as an emergent, "as needed" dose.[15] It is also not clear why any antipsychotic drug was ordered as a medical treatment. Dr. Cary discusses Haldol generally in her affidavit, but she does not explain the relevant facts or reasoning to suggest that she exercised "professional judgment" if she, in fact, did order an antipsychotic in April 2016. Accordingly, Dr. Cary fails to establish that she is entitled to summary judgment, and she will have to file another motion for summary judgment addressing these discrepancies.

2. Authorizing Haldol as to Dr. Cary

Plaintiff's related claim against Dr. Cary is that her alleged orders for Haldol were contrary to noted restrictions in his medical record and Advanced Medical Directive. A medical record created in 2012 by the Department of Behavioral Health notes, "Adverse Drug RXN to Thorazine . . . 96." The Advanced Medical Directive created in 2014 noted Plaintiff's allergy to "[a]nti-psychotics and psychotropics, including, but not limited to Thorazine" because they cause "extrapyramidal symptoms, extreme anxiety, dry mouth, and other adverse reactions[.]"

Dr. Cary does not address this claim about whether she was deliberately indifferent to a substantial risk of harm by allegedly prescribing Haldol versus another antipsychotic drug or another treatment option. See Farmer v. Brennan, 511 U.S. 825, 838 (1994) (noting deliberate indifference requires a state actor to have been personally aware of facts indicating a substantial risk of serious harm, and the actor must have actually recognized the existence of such a risk);

---

[15] Plaintiff filed an incomplete copy of his medical record and without a custodian's certification. See, e.g., Fed. R. Evid. 803(6) (discussing hearsay and business records). Nonetheless, the medical record seems to contradict Plaintiff's assertion that Dr. Cary ordered maintenance doses or emergency doses on April 14 or 23, 2016. A nurse's psychiatry progress note dated April 6, 2016, states, "Start Haldol Dec 50mg IM q4 weeks on 4/7, 5/5, 6/2, 6/30 – over objection." The entry on April 23, 2016 – "Ativan 2 mg IM STAT RBVO Per Dr. Cary" – indicates Dr. Cary ordered a narcotic and not an antipsychotic. Inasmuch as the evidence is presently inadmissible for summary judgment and Dr. Cary avoids addressing the medical record, the court will not make the inference adverse to Plaintiff as the non-movant.

Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990) (noting deliberate indifference may be demonstrated by either actual intent or reckless disregard and a health care provider may be deliberately indifferent when the treatment provided is so grossly incompetent, inadequate, or excessive as to shock the conscience or is intolerable to fundamental fairness). The medical record and Plaintiff's alleged statements would have informed Dr. Cary of the risk of an allergic reaction to antipsychotic drugs.[16] Accordingly, Dr. Cary fails to establish that she is entitled to summary judgment, and she will have to file another motion for summary judgment addressing this claim.

3. Defendants collectively

In part of the first claim, Plaintiff generally alleges that the defendants other than Dr. Cary are also liable for the use of an antipsychotic drug. Except for Dr. Lee, those other defendants are entitled to qualified immunity because the claims fail.

The record does not support any inference that defendants Clarke, Robinson, Madsen, or Robichaux-Watson prescribed an antipsychotic drug. However, at least one medical record entry suggests that Dr. Lee prescribed Haldol, but Dr. Lee did not file an affidavit to explain the "professional judgment" why he, arguendo, ordered an antipsychotic drug. Accordingly, Clarke, Robinson, Madsen, and Robichaux-Watson are entitled to qualified immunity and summary judgment for the medication claims, but Dr. Lee will have to file another motion for summary judgment addressing the medication claims.

---

[16] Notably, nobody refutes any pharmacological difference between Haldol and Thorazine, and the court will not make that inference adverse to Plaintiff as the non-movant.

## B.

Plaintiff alleges that each defendant was deliberately indifferent to a substantial risk of harm caused by the isolating conditions at Wallens Ridge, Red Onion, and Marion. Related to this claim is his allegation that each defendant "deliberately disregarded Plaintiff's care needs" and also deliberately withheld "necessary or clinically prescribed treatment." Plaintiff does not explicitly name the "clinically prescribed treatment" but he references DBT, which was first suggested by the licensed clinical psychologist in 1998 and also referenced during his criminal proceedings.

The Eighth Amendment, and not the Fourteenth Amendment as Plaintiff incorrectly believes, applies to these claims. Plaintiff argues that his status as "an involuntary committee" from the NGRI verdict is not "extinguished" by being in the VDOC's custody. Such an interpretation would certainly be in his favor as he would avoid the consequences of being an imprisoned convict. However, a "conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in _any_ of its prisons. . . . That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules. . . ." Meachum v. Fano, 427 U.S. 215, 224-25 (1976) (original emphasis). It is axiomatic "that, by virtue of their convictions, inmates must expect significant restrictions, inherent in prison life, on rights and privileges free citizens take for granted." McKune v. Lile, 536 U.S. 24, 40 (2002). It has been long settled that a state may punish convicts within its care, albeit not cruelly and unusually per the Eighth Amendment, after a formal adjudication of guilt. See, e.g.,

Ingraham v. Wright, 430 U.S. 651, 671-672, n.40 (1977). Accordingly, the Eighth Amendment controls the disposition of the conditions of confinement claims.

1. Clarke and Robinson as to conditions at Wallens Ridge, Red Onion, and Marion

Clarke and Robinson are entitled to qualified immunity in their individual capacities for the allegation that they were deliberately indifferent by not stopping the isolating conditions Plaintiff experienced at Wallens Ridge, Red Onion, and Marion.[17] To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to people like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). To satisfy the requirements of the first element, a plaintiff must establish: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff. Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984). Establishing a "pervasive" and "unreasonable" risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions, and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury. Id. at 373-74. A

---

[17] Plaintiff also faults Clarke and Robinson for not "making and implementing [a] policy to stipulate availability of treatment, programs, and activities for persons under involuntary commitment . . ." Plaintiff describes the missing policy as one that prohibits punitive confinement and treatment options for someone previously civilly committed as NGRI. This allegation is more appropriately categorized as an official capacity claim, to which qualified immunity is not a defense. Accordingly, the court defers the disposition of official capacity claims until after resolving qualified immunity.

plaintiff may establish deliberate indifference by demonstrating a supervisor's "continued inaction in the face of documented widespread abuses." Id. at 373.

In support of his allegation, Plaintiff refers to a piece of mail and one an alleged incident of a mentally ill inmate who died in a Massachusetts prison in 2009 while Clarke was Commissioner of the Massachusetts Department of Corrections. Plaintiff alleges:

> Because defendant Clarke is all too familiar with the danger posed to mentally ill inmates by policies or customs that can cause them serious even fatal harm, from his prior position as director of the Massachusetts Dep't of Corrections . . ., where an inmate was killed by mistreatment and he was investigated. [H]e is aware of the need for policies and regulations, and to enforce such, as regards treatment of mentally ill individuals – as [P]laintiff – in his custody.

Plaintiff had mailed to Clarke in July 2015 a copy of a "motion to amend petition for writ of prohibition" to stop his transfer from the Department of Behavioral Health to the VDOC.

Plaintiff's conclusory allegations fall short establishing Clarke's or Robinson's personal or supervisory deliberate indifference. Nothing in the record supports an inference that these defendants knew Plaintiff was housed in the VDOC at any of these three prisons, suffered a mental illness, was confined in isolation, or had symptoms of his illness exacerbated by the isolating conditions of confinement. Even if these defendants knew generally that NGRI inmates, like Plaintiff, are housed in isolating conditions that exacerbate mental illnesses, as Plaintiff alleges, the VDOC provides qualified mental health practitioners to treat inmates who suffer mental illnesses, like Plaintiff, and prison administrators like Clarke and Robinson are entitled to rely on professional medical judgments. Miltier, 896 F.2d at 854. As evidenced in this case, VDOC policies and state laws allow trained medical personnel to petition a state court to transfer mentally ill inmates to a medical facility when needed. Plaintiff fails to address these two important facts and does not establish that Clarke or Robinson deliberately disregarded

conduct that posed a pervasive and unreasonable risk of constitutional injury. See Orpiano v. Johnson, 632 F.2d 1096, 1101 (4th Cir. 1980) (recognizing that taking reasonable remedial steps to prevent a harm contradicts deliberate indifference). Furthermore, an isolated incident from another state and nearly ten years ago is too remote to support an inference of a current widespread or pervasive risk in the VDOC. Moreover, there is nothing to indicate Clarke knew the contents of the motion to amend petition for writ of prohibition, and the motion's contents are not in the record. Accordingly, Clarke and Robinson are entitled to qualified immunity and summary judgment in their individual capacities.

2. Madsen, Dr. Cary, Dr. Lee, and Warden Robichaux-Watson as to conditions at Wallens Ridge, Red Onion, and Marion

Plaintiff faults Madsen for causing Plaintiff to be housed at Wallens Ridge and Red Onion, and he faults Dr. Cary, Dr. Lee, and Warden Robichaux-Watson for the conditions he experienced at Marion. Wallens Ridge and Red Onion are Security Level-5 and Security Level-S prisons, respectively, but Plaintiff believes he should not have been housed there as a Security Level-3 inmate. Plaintiff argues that Madsen understood as a psychologist that isolating Plaintiff in these restrictive facilities would exacerbate his mental illness and cause him to harm himself. Plaintiff cites in support Madsen's email to staff, indicating that Plaintiff was housed at Red Onion because he is a "management problem" and not because of "violence or alleged violence." Plaintiff wants to be sent to a VDOC "Mental Health Unit" or "a more appropriate" facility than Wallens Ridge and Red Onion where he self-harms due to the isolating conditions. Ostensibly, Madsen and Drs. Cary and Lee are familiar with the treatment of mental illnesses, including Borderline Personality Disorder. Similarly, Drs. Cary and Lee and Warden Robichaux-Watson were ostensibly familiar with conditions in Marion's Acute Care Treatment Program and the

consequences of, or lack of, a treatment plan on an inmate committed for involuntary mental health treatment.

A plaintiff must show that a defendant acted with deliberate indifference to a substantial risk of serious harm to state a violation of the Eighth Amendment's Cruel and Unusual Punishments Clause. Farmer, 511 U.S. at 828; West v. Atkins, 487 U.S. 42, 48 (1988). Deliberate indifference requires a state actor to have been personally aware of facts indicating a substantial risk of serious harm, and the actor must have actually recognized the existence of such a risk. Farmer, 511 U.S. at 838. "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." Miltier, 896 F.2d at 851; see Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'"). "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." Miltier, 896 F.2d at 851-52. A serious medical need that implicates the Eighth Amendment is a condition that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

Both medical and non-medical personnel may be deliberately indifferent. A health care provider may be deliberately indifferent when the treatment provided is so grossly incompetent, inadequate, or excessive as to shock the conscience or is intolerable to fundamental fairness. Miltier, 896 F.2d at 851. A non-medical prison official may be deliberately indifferent when the official was personally involved with a denial of treatment, deliberately interfered with a prison

doctor's treatment, or tacitly authorized or was deliberately indifferent to the medical provider's misconduct when even a lay person would understand that the medical provider is being deliberately indifferent. Id. at 854.

Viewing the inferences in his favor, Plaintiff has alleged sufficient facts to present colorable Eighth Amendment claims against Madsen, Dr. Cary, Dr. Lee, and Warden Robichaux-Watson about the isolating conditions of confinement at Wallens Ridge, Red Onion, and Marion.[18]

As a medical professional familiar with Plaintiff's medical history, Madsen, would understand Plaintiff's risk of self-harm increases each time he is left isolated. Psychologist Madsen purportedly caused Plaintiff to be sent to Wallens Ridge, a Level-5 prison, and Red Onion, a Level-S prison, where Plaintiff would likely remain in isolating conditions for years despite being a Level-3 inmate. Madsen purportedly caused this transfer on account of Plaintiff's difficulty to management and without regard to his mental health needs. By allegedly causing his transfer, it is plausible that Madsen recklessly disregarded a substantial risk that the isolating conditions of Wallens Ridge and Red Onion would exacerbate Plaintiff's mental illness and cause him to seriously self-harm. A psychologist has noted as early as 1998 that "[i]n almost all cases, the frequency and intensity of self-destructive behavior worsens" for people with Plaintiff's mental illness as a consequence of long-term institutionalization. Yet, Madsen assigned Plaintiff to the most restrictive prisons in the VDOC.

Similarly, Dr. Cary and Dr. Lee are both psychiatrists at Marion and familiar with Plaintiff's treatment needs, and they allegedly relied only on Haldol, a sedative to which the

---

[18] Dr. Lee and Warden Robichaux-Watson did not file affidavits. Madsen does not address the merits of the claim in his affidavit. As noted earlier, Dr. Cary only describes Haldol generally in her signed affidavit and not the merits of any claim.

medical record noted risks causing an allergic reaction, to treat Plaintiff's mental illnesses. Dr. Cary and Dr. Lee were responsible for crafting a treatment plan that could include therapeutic programs, individual counseling, educational services, wing meetings, work programs, and a therapeutic environment. Yet, Plaintiff alleges that Dr. Cary and Dr. Lee merely order a sedative and warehouse him in isolation. Neither Dr. Cary nor Dr. Lee has discussed whether they created a treatment plan or whether DBT may be a viable treatment.

Plaintiff also has sufficiently alleged Warden Robichaux-Watson's deliberate indifference. As noted below for the retaliation claim discussed below, Warden Robichaux-Watson was personally involved with a denial of treatment at Marion by keeping Plaintiff in isolation and without access to a treatment other than sedation. Also, a jury could find that Warden Robichaux-Watson's ambivalence to Dr. Cary's and Dr. Lee's promotion of Plaintiff's self-harming behaviors by keeping him in isolation constitutes deliberate indifference. Accordingly, Madsen, Dr. Cary, Dr. Lee, and Warden Robichaux-Watson are not entitled to qualified immunity based on the present record.

## C.

Plaintiff claims that Dr. Lee and Warden Robichaux-Watson retaliated against him for filing this lawsuit against Dr. Cary. Dr. Lee and Warden Robichaux-Watson are not presently entitled to qualified immunity or summary judgment for these claims.

For an inmate to "state a First Amendment retaliation claim, [the] plaintiff must show that (1) his speech was protected, (2) the alleged retaliatory action adversely affected his protected speech, and (3) a causal relationship existed between the protected speech and the retaliation." Hoye v. Gilmore, F. App'x 764, 765 (4th Cir. 2017) (citing Raub v. Campbell, 785

23

F.3d 876, 885 (4th Cir. 2015)). "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005).

Retaliation against Plaintiff for exercising the right to access courts states a cognizable claim involving protected speech that was clearly established before the events of this lawsuit. See, e.g., Hudspeth v. Figgins, 584 F.2d 1345, 1347-48 (4th Cir. 1978). It is not determinative that Plaintiff continued prosecuting this action despite the alleged retaliatory act of continued isolation. Plaintiff's description of long term isolation in Marion without medical treatment other than forcibly administered sedatives that may cause an allergic reaction seems reasonably calculated to likely deter a person of ordinary firmness from prosecuting this lawsuit. Accordingly, Defendants' motion for summary judgment must be denied as to the retaliation claims against Dr. Lee and Warden Robichaux-Watson.

## V.

Plaintiff repeatedly accuses Defendants of failing to follow various state and VDOC policies. However, a claim that prison officials have not followed their own policies or procedures does not amount to a constitutional violation. See Riccio v. Cnty. of Fairfax, Virginia, 907 F.2d 1459, 1469 (4th Cir. 1990) (holding that if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue); Belcher v. Oliver, 898 F.2d 32, 36 (4th Cir. 1990) ("[F]ailure to follow procedures established for the general protection and welfare of inmates does not constitute deliberate disregard for the medical needs of a particular [inmate]."). Thus, Defendants are entitled to qualified immunity and summary judgment for such accusations.

24

## VI.

For the foregoing reasons, the court grants in part and denies in part Defendants' motion for summary judgment as to qualified immunity.[19] The court also grants Plaintiff's motion to correct the record and denies as meritless Plaintiff's motion to strike the affidavit of a non-defendant. Madsen, Dr. Cary, Dr. Lee, and Warden Robichaux-Watson shall file a motion for summary judgment supported by affidavit(s) within forty-five days pursuant to Standing Order 2013-6. The official capacity claims against Clarke and Robinson about the availability of treatments, programs, and activities for inmates previously deemed NGRI remain pending. The parties shall complete discovery within the next sixty days, and Defendants shall file a motion for summary judgment addressing the remaining claims within forty-five days thereafter pursuant to Standing Order 2013-6.

**ENTER:** This _____ day of January, 2018.

/s/ Michael F. Urbanski

_____
Chief United States District Judge

---

[19] Also, Plaintiff invokes the Virginia Administrative Code as a basis for this action, but he fails to substantiate how he has an actionable legal cause under that code. As the court is not sure what state law, if any, Plaintiff may be pursuing, any state law claim is dismissed without prejudice.