# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **BRIAN FARABEE,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:16cv325 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **HAROLD CLARKE, et al.,** | ) | |
| Defendants. | ) | |

The pro se plaintiff, Brian Farabee is a Virginia Department of Corrections, ("VDOC"), inmate currently involuntarily committed to Marion Correctional Treatment Center, ("MCTC"). This matter is before the undersigned on the plaintiff's motion for entry of preliminary injunctive relief. (Docket Item No. 106) ("Motion"). The Motion is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). An evidentiary hearing was held before the undersigned on May 8-9, 2018. The undersigned now submits the following report and recommended disposition.

## I. Facts

By Complaint filed July 1, 2016, Farabee brought this § 1983 action against the VDOC and various VDOC officials and mental health workers. (Docket Item No. 1). In his Amended Complaint, (Docket Item No. 71), Farabee alleged that the conditions of his confinement in several correctional facilities and a lack of adequate mental health treatment have violated his constitutional and federal statutory rights. By Opinion and Order entered January 12, 2018, (Docket Item

Nos. 99, 100), the court entered summary judgment in the defendants' favor on all but the following claims:

1.    A claim against all defendants in Count I based on denial of adequate mental health treatment and conditions of confinement;

2.    A claim against defendant Dr. Cary in Count III based on allegations of forced medication, conditions of confinement and unlawful seizure; and

3.    Claims against defendants Dr. Lee and MCTC Warden Robichaux-Watson in Count V based on conditions of confinement and retaliation.

The Motion before the court seeks the entry of preliminary injunctive relief preventing the defendants Dr. Lee, Robichaux-Watson and Madsen from participating any further in Farabee's placement, treatment or care within the VDOC, ordering Farabee be transferred to a facility that offers a Common Fare Diet, ordering the return of Farabee's personal property and ordering that he be released from segregation and placed in a general population prison setting.

Farabee called a number of inmate witnesses to testify at the evidentiary hearing. VDOC Inmate Eric Douglas Powers testified that he has a history of mental illness and was transferred to MCTC in mid-January 2018 after he attempted suicide at Pocahontas State Correctional Center, ("Pocahontas"). He said that he was placed in the Intensive or Secured Diversionary Treatment Program, ("IDTP" or "SDTP"), in Unit 1, Pod A at MCTC. Powers said that he attended group therapy sessions in the mornings and afternoons as part of this treatment program. These sessions were led by a Qualified Mental Health Professional, ("QMHP"), Dr. Haynes, a social worker, nurse or treatment officer.

Powers said that he was at MCTC for three weeks before he saw Dr. Lee. He said that he asked Dr. Lee to discontinue his antidepressant medication, Effexor, but Dr. Lee refused. Powers said the medication caused him to hallucinate and suffer flu-like symptoms, flashes of light in his peripheral vision and cold sweats. Powers said that he continued to take Effexor because taking prescribed medication was a condition of participating in IDTP.

Powers testified that the IDTP Unit at MCTC was a general population unit, but that the inmates were restrained whenever they left their cells. In fact, he said, that the inmates were restrained to tables during their group therapy treatment sessions. Powers said that Farabee arrived at the IDTP Unit in MCTC a week or two after he did. He said that Farabee was removed from the unit a few days after he arrived and placed in segregation. He said that there were 10 or 11 inmates who were designated to participate in IDTP while he was at MCTC. He further stated that all but four of these inmates refused to participate in IDTP because of the way they were treated.

Powers admitted that he knew that Farabee had somehow injured himself before he was placed in segregation at MCTC. He said that he did not know anything about Farabee's or any other inmate's mental health history.

Powers testified that he was removed from Unit 1A and placed in segregation in Unit 1B after he punched his cell wall injuring his hand on March 8, 2018. Powers said that he punched his cell wall because an inmate in an adjoining cell had been beating on the cell walls and yelling racist white supremacist statements.

Powers stated that he had done nothing to justify being placed in segregation and that when he arrived at the segregation cell, he was assaulted without reason by the officers who accompanied him. Powers said he was injured in the incident and requested medical treatment. He said that later in the day, Warden Robichaux-Watson came to the segregation unit with Assistant Warden Cregger and an investigator. Powers said he told the Warden what had occurred, and she told him that "she did not buy it." He said that he was transferred to Wallens Ridge State Prison, ("Wallens Ridge"), the next day, March 9, under more restrictive conditions. He also said that Wallens Ridge was not providing him with adequate mental health treatment.

Powers admitted on cross-examination that he had a history of suicide attempts while in the VDOC. He said that his last attempt was in December 2017 when he was housed at Pocahontas State Correctional Center.

Powers said that he knew that Farabee was still being held in segregation at MCTC when Powers was transferred on March 8. Powers said he knew this because, when he was taken to daily recreation, he was escorted past Farabee's cell. Powers stated that he witnessed Correctional Officer Taylor and a Captain harass Farabee and make fun of him over his hair and hygiene. Power also testified that, on one occasion, he heard Warden Robichaux-Watson tell Farabee: "You're back Mr Farabee? You know this isn't going to end well."

Powers testified that, when he first arrived at MCTC, he was placed in a cell with only a safety smock and safety blanket. He said it was six or seven days later before he was given his personal property. Powers said that, unlike other VDOC inmates, inmates at MCTC were not allowed to possess electronics such as radios

or music players and were not allowed to purchase commissary items containing caffeine.

MCTC Inmate Angel Cartegena also testified at the May hearing. Cartegena testified that he had been incarcerated at MCTC on nine occasions. He said that he suffered from schizophrenia and was very suicidal. He said that he arrived at MCTC on this occasion on March 20, 2018, after being committed for self-harm while housed at Wallens Ridge. Cartegena said that he had been housed in general population with Farabee on at least five previous occasions, with the last occurring in 2011. He said that he had never known Farabee to harm anyone other than himself and that he had never known Farabee to harm himself other than while being housed in segregation. Cartegena testified that he had observed Farabee previously taken to a hospital on a "number" of occasions for harming himself.

Cartegena admitted that did not have any knowledge regarding Farabee's mental health diagnosis because VDOC mental health workers would not talk to inmates about other inmates' mental health issues. He conceded that he had not reviewed Farabee's mental health management or treatment plan. He said that Farabee always has been held in segregation when he, Cartegena, has been at MCTC.

Cartegena testified that he was being held in general population at MCTC. He said that inmates who were involuntarily committed and held in segregation at MCTC were required to participate in a segregation release plan, or "SRP," to be housed in general population now. Until recently, he said that only inmates designated an "S," or segregation security level, were required to complete an SRP.

Cartegena stated that it could take an inmate two to three weeks to complete the plan and be moved from segregation to general population at MCTC.

Cartegena testified that when an inmate is committed to MCTC, the inmate is admitted and held on suicide precautions. He said that some inmates are held up to 60 days on these precautions without access to their property. He said that he progressed to an SRP after being held a month at MCTC on this occasion. He said that he received some of his property after only two weeks. Cartegena testified that he was aware that other inmates at MCTC had ripped beds out of the floor or sinks out of the wall to use them to harm themselves. He also said that inmates, including himself, would sometimes jump off of the sinks in their cells in an attempt to harm themselves. He said that he had been assaulted by correctional officers at MCTC and that he had seen other inmates assaulted by correctional officers at MCTC in the past.

Cartegena stated that, after he arrived at MCTC on March 20, 2018, he heard Farabee constantly requesting access to his property. He said that he had never witnessed anyone else be deprived of his property as long as Farabee had been. He further said that he believed that officials at MCTC were denying Farabee access to his property in retailiation for filing this lawsuit.

Cartegena stated that psychiatric nurse practitioners make rounds through the units at MCTC every day. He said that, when he recently had concerns about his mental health medications, he spoke with his nurse practitioner, Emily Fields, and they worked a couple of months to adjust Cartegena to the correct medication in the correct dosage to allieve his symptoms. Cartegena said that he has never

been seen by Dr. Lee at MCTC because Dr. Lee has not been on his treatment team.

Inmate Chad Duncan stated that he arrived at MCTC on this occasion on February 28, 2018. Duncan said that, since arriving at MCTC on February 28, he has been taken to a hospital and treated for self-harm or suicide attempts on four occasions. Duncan said that he suffered from schizophrenia, bipolar disorder and a personality disorder and that he liked to cut himself or insert objects into his body. He said that this was his second commitment to MCTC and that, each time, an act of self-harm had caused his commitment. He stated that, after arriving at MCTC on this occasion, he received his property after a month and a half.

Duncan testified that he had been transferred to a segregation cell at MCTC two days before the hearing after he cut an artery in his left arm with an ink pen. Duncan said that he spent a night in the hospital and, then, was returned to a segregation cell at MCTC with no personal belongings. He said that he was placed on strip cell status in a cell with no sink, no bed and a mattress on the floor and was given only his boxer shorts to wear and a small safety blanket. After a couple of days, Duncan said that he was given a t-shirt and, later, some pants to wear.

Duncan stated that he agreed to participate in the IDTP because he had been told that it would be a good program for him. He said that he was transferred from River North Correctional Center, ("River North"), to MCTC. He said that he started harming himself after he had been at MCTC about one month. Duncan stated that Dialectical Behavioral Therapy, or "DBT," was offered to the inmates in the IDTP at MCTC, but he said that it occurred in the presence of correctional officers and was not held in a confidential or private setting. Duncan said that this

lack of privacy makes him feel uncomfortable "opening up" to the therapists. On further questioning, Duncan admitted that he did not know whether DBT was intended to be done in a group or individual setting.

Duncan testified that inmates in the IDTP at MCTC are restrained whenever they are removed from their cells, In fact, during group sessions, the inmates are chained to a table. Duncan said that he was prescribed a number of psychiatric medications. He said that he was not aware of the effect of consuming caffeine with these medications, but he said that he was allowed to order caffeinated beverages from the commissary to consume while on these same medications at River North.

Inmate Eric Jones testified that he arrived at MCTC on February 22, 2018. Jones stated that he suffered from serious mental illness and had a history of harming himself. Jones also testified that he suffered from a medical condition, hemophilia, which posed an added risk of danger when he harmed himself. Jones stated that he had cut himself on numerous occasions while being housed at Sussex I State Prison before being transferred to MCTC. Jones stated that, when he arrived at MCTC, he was placed in a segregation cell.

Despite his earlier testimony that he had arrived at MCTC in February, Jones stated that he had participated in the IDTP at MCTC for three to four months. He said that the inmates in the program were all housed in single cells and were placed in restraints when they were taken from their cells. He said that inmates were restrained and chained to a table during their group sessions. Jones stated that he was not sure whether MCTC offered DBT. He said the group sessions were led by treatment professionals. He also said that the inmates in the program had the

opportunity to earn more property and privileges if they progressed through the program. He also said that he did not know how long it would take an inmate to complete the IDTP.

Jones stated that he was placed on suicide precautions at MCTC after he attempted to harm himself. He said that he was placed in strip-cell status and given a safety smock to wear. He said that it was about two weeks before he was allowed to have any of his property in his cell.

Despite repeated recent attempts to harm himself during the previous week, Jones stated that he believed that he should be housed in less restrictive housing. Jones stated that he suffered from depression and other psychological diagnoses, but he stated that he did not take any antidepressant medication. He said that he had recently used an ink pen and cardboard containers from his meal trays to cut himself.

Farabee testified that he had been housed at MCTC since January 26, 2018. He said that he had been held in segregation housing for this entire time, except for the days he had been held in the medical unit. Farabee said that, prior to arriving at MCTC, he was being held in segregation at Red Onion on January 6, 2018, when he heard another inmate tell mental health workers that he was suicidal. Farabee said that the mental health workers did nothing to prevent the other inmate from committing suicide and he hanged himself. Farabee said that he reported to investigators that the deceased inmate had warned mental health workers before taking his life. As a result, Farabee said that he was threatened by supervising mental health worker Terrance Huff. Farabee testified that Huff told him, "We are

going to get you out of here. You like to talk to investigators and file complaints."
Farabee said he was transferred from Red Onion to Powhatan Reception Center.

Farabee said that, while he was housed at Powhatan, he was informed of the
IDTP. He said he was told that the program offered an array of treatment and that
the participating inmates were housed in a general population setting. Farabee said
that he agreed to be transferred from Powhatan to MCTC to participate in IDTP
and that Gina Porterfield and Eric Madsen were the mental health workers
responsible for arranging his transfer to MCTC.

Farabee testified that, within an hour of his arrival at MCTC on January 26,
2018, he met with his treatment team, which included Dr. Lee, Sandra Halsey,
Laura Campbell and Nurse Jennifer Bonham. He said that Nurse Revonda Welch,
Nurse Practitioner Tammy Jones, Correctional Officer Coe and Psychologists
Haynes and Amanda McGrady also were present at this meeting. Farabee said that
Halsey told him that MCTC was going to seek to involuntarily commit him
because he had not been eating. Farabee admitted that he had been abstaining from
certain non-kosher foods, but he denied that he had been participating in any
hunger strike or refusing to eat. Farabee said that MCTC obtained a court order
involuntarily committing him and allowing the MCTC mental health workers to
forcibly medicate and feed him, if necessary.

As a result, Farabee said that he was placed in a segregation strip cell in only
a safety smock with no mattress and no blanket. Farabee stated that he did not
threaten any harm to himself, but, nonetheless, was held in these conditions for
almost two months until around February 23 to 26, 2018, when he was moved to a
cell in Unit 1A, where he participated in the IDTP program for about three days.

During this time, Farabee said that he saw no treatment team members and participated in no group treatment sessions. He said he was allowed to go outside for recreation on a couple of occasions and that he was allowed to watch television in the pod for about one-half hour on a couple of occasions. Farabee admitted that, on one occasion, he defecated in the outdoor recreation cage. Farabee said that he told correctional officers that he needed to go to the bathroom, but they refused to take him inside. He said that he had no choice but to use the bathroom in the recreation cage.

Farabee said that, after being in Unit 1A about three days, he asked to see a nurse because he had accidentally scratched a healing wound on his abdomen and made it bleed. As a result, Farabee said that he, again, was moved to a strip cell in Unit 1B with no property and only the clothes he had on and a safety blanket. Farabee specifically denied harming himself or threatening to harm himself before the move. Farabee stated that after being placed in Cell No. 1 in Unit 1B he was moved to Cell No. 4 and placed in four-point restraints. Farabee said he was held in four-point restraints for a day and a half, being released only to eat meals and go to the bathroom. Farabee said that the staff at MCTC obtained another court order involuntarily committing him and that he continues to be held under the terms of that court order.

Farabee testified that the last time he had harmed himself was when he had used a piece of metal from his cell at Red Onion to cut his abdomen in either late December 2017 or early January 2018. Farabee said that, on the day of his hearing, he was being held in a segregation cell in Unit 1B at MCTC. He said that most of his legal materials and some of his other property had been returned to him in late March or early April. Farabee stated that, while being held in segregation, he did

not participate in any group therapy. He said that mental health workers did make rounds through the building, but that they just stopped by each cell door, and there was no opportunity to speak to them confidentially. Farabee said that, when he requested to speak to mental health workers privately, they refused and reported that he was refusing treatment.

Farabee testified that members of his treatment team did not do rounds in the segregation unit where he was being held. He said that when he asked mental health workers from other treatment teams to assist him, he was told that they were not on his treatment team. Farabee said that Dr. Lee either did not do rounds or did so rarely. He testified that he had seen Dr. Lee do rounds only once or twice back in 2016. Farabee testified that Halsey did round less than 50 percent of the time. He said that, when Halsey did conduct rounds in his building, she purposefully did rounds while he was outside at recreation. Farabee did concede that Halsey had made rounds and spoken to him the day before his hearing. Farabee also admitted that Counselor Crystal Bolatch did rounds in his building "fairly regularly," but he said that Bolatch performed only clerical work and did not perform any mental health treatment.

Farabee also admitted that he had monthly meetings with his treatment team sometime in March and, again, in mid-April. Farabee said that, at the March meeting, Dr. Lee was very angry with him and did not tell him anything. Farabee said that he asked why his prescription for Klonopin had been discontinued. He said that Dr. Lee told him he had placed a standing order in his mental health records to allow Farabee to be forcibly medicated with a Haldol injection if he became agitated. Farabee said that this contradicted an advance directive he had signed refusing forced medication. Farabee asked the court to consider an affidavit

from Shelia Burr, his "Legally Authorized Representative," stating that she had not given authorization or consent for the VDOC or employees of MCTC to forcibly medicate Farabee. (Docket Item No. 142-1 at 85.) Farabee conceded, however, that he has not been forcibly medicated while held at MCTC.

Among the documents Farabee has asked the court to consider are documents showing that Farabee was ordered involuntarily committed to MCTC by a special justice on January 25, 2018, and, again, on February 28, 2018. (Docket Item No. 142-1 at 24-25, 73-74.) Also included is a January 25, 2018, order finding that Farabee was incapable of giving informed consent and allowing his treatment for "psychiatric illness, wound care, intake of fluids and nourishment, lab work." (Docket Item No. 142-1 at 26-27.) On February 28, 2018, another special justice entered another order finding Farabee incapable of giving informed consent and authorizing treatment for unspecified depressive disorder and borderline personality disorder. (Docket Item No. 142-1 at 75-76.)

Farabee said that he was informed at the April meeting of his treatment team that MCTC was in the process of trying to discharge him because his team did not believe he needed to be in acute care any longer. He said they informed him that they were referring him to a Multi-Institutional Treatment Team, ("MITT"), to be discharged. He said that Dr. Lee had told him that he would be discharged from MCTC and that he believed his discharge was imminent. Farabee said that he had filed numerous complaints while being housed at MCTC in an effort to receive DBT. Farabee asked the court to consider an April 23, 2018, letter from Kevin McWilliams, Ph.D., Licensed Clinical Psychologist with Williamsburg Psychology Center. (Docket Item No. 142-1 at 2-3.) Farabee said that McWilliams had treated him in 1998 before he came into VDOC custody and was recommending that he

receive DBT. Farabee said that he had been in VDOC custody since convicted of a probation violation and sentenced to six years', eight months' custody in 2015. He said the McGrady had told him that group DBT was offered at MCTC.

In his April 23, 2018, letter, McWilliams states that DBT is the treatment of choice for persons suffering from personality disorders. (Docket Item No. 142-1 at 2.) McWilliams stated, "Almost all severely borderline personality disordered patients … engage in behaviors such as cutting, self-burning, ingestion of pens/bolts or some equally problematic manifestation. Such is part and parcel of the condition." (Docket Item No. 142-1 at 2.) McWilliams opined that Farabee's "primary problem" was borderline personality disorder, not antisocial personality traits. (Docket Item No. 142-1 at 2.) He further opined that Farabee should receive individual DBT therapy. McWilliams also stated that group therapy often did not work well for patients with borderline personality disorders because they would exaggerate symptoms to compete for desired attention and often had a history of intense abuse, which they might not want to discuss openly.

Farabee testified that he was being held at MCTC when he originally filed suit in July 2016, and he said he had been returned to MCTC when he filed his Amended Complaint. Farabee said that every inmate who is transferred to MCTC is transferred after an incident of self-harm. He said that after two weeks of being at MCTC without self-harm, most inmates receive their personal property. Farabee said that he, to the contrary, had been kept on strip cell to prevent his access to his legal materials. Farabee said that he was the only inmate at MCTC to have a Special Housing Management Plan implemented against him. He said the housing plan was imposed in an effort to prevent him from prosecuting this case against the defendants.

-14-

Farabee testified that he wanted to be transferred to the residential unit in general population at MCTC. He said that being housed in segregation was hurting his mental health. He said that he had a long history of suicide attempts and self-harm while being held in segregation. Farabee cited as a example a serious injury he sustained to his intestines in 2012 after he swallowed a plastic spoon. Farabee asked the court to consider as evidence the medical report of the surgery required to repair the injury suffered by swallowing the spoon. (Docket Item No. 85-2 at 2-3.) This July 16, 2012, Operative Note shows that Dr. Richard D. Zlotnik, M.D., successfully performed an exploratory laparotomy, closure of sigmoid perforation and transverse loop colostomy on Farabee at Smyth County Community Hospital. Dr. Zlotnik noted that he found, and removed, the plastic spoon Farabee had swallowed.

Farabee also asked the court to consider a medical report showing that he was treated at Johnston Memorial Hospital on May 3, 2017, for abdominal pain after he had sustained a self-inflicted stab wound, and he reported placing pieces of a cup, metal and concrete and feces in the wound while being housed at MCTC. (Docket Item No. 142-1 at 4-5.) It was recommended that Farabee undergo a exploratory laparotomy. (Docket Item No. 142-1 at 5.)

Farabee also asked the court to consider a number of Institutional Classification Authority, ("ICA"), documents. (Docket Item No. 142-1 at 77-80.) These ICA documents show that Farabee's security level prior to June 13, 2017, was a 5. An ICA hearing was held on June 13, 2017, and his security level was changed to segregation – mental health due to numerous disciplinary charges for self-mutilation. The Hearing Disposition section noted: "Offender not suitable for population at this time." (Docket Item No. 142-1 at 78.) This decision was

approved by Warden Robichaux-Watson on June 13, 2017. (Docket Item No. 142-1 at 78.) These documents also show that Farabee's status was changed to segregation – pre-hearing detention on February 13, 2018, based on disciplinary charges he received for refusing to move from segregation to the IDTP Unit at MCTC. (Docket Item No. 142-1 at 79.) This form stated that Farabee did not "wish to move to this unit because it does not meet his needs." (Docket Item No. 142-1 at 79.) These documents also show that Farabee's status was changed to segregation – general detention on February 26, 2018, after he "exhibited self injurious [sic] behavior that resulted in involuntary commitment." (Docket Item No. 142-1 at 80.) This document continues, "Team reports offender continues to be uncooperative with treatment." (Docket Item No. 142-1 at 80.) This status change was approved by Warden Robichaux-Watson on March 6, 2018. (Docket Item No. 142-1 at 80.)

Farabee also submitted a Self-Management Housing Plan, ("SMHP"), for him dated March 1, 2018, into evidence. (Plaintiff's Exhibit No. 3; Docket Item No. 145-3.) This Plan stated that Farabee would be housed in a mental health cell with a camera on 15-minute watch status. He was not to be provided any metal or rigid objects. He was to be provided a Clinical Precautionary Diet with no utensil and no plastic food tray to prevent the use of these for self-harm. The Plan also noted that Farabee was allowed to have 10 pages of his legal materials at a time and could exchange these materials as needed. The Plan noted that Farabee was not to have any other items of his personal property until he was removed from suicide precautions. Otherwise, Farabee was authorized to have a mattress, safety blanket, boxers, t-shirt, socks, safety smock, shower shoes or other soft shoes. Farabee also was authorized to have writing paper, reading material and mail and a pen while he needed it to sign documents while supervised. Farabee was to be restrained any time he was removed from his cell.

-16-

The Plan also stated:

Advancement will be reviewed on a weekly basis with progress documented weekly by QMHP. Treatment team will schedule reviews twice each month or more frequently if needed. All dates and timeframes listed are approximate given possible schedule conflicts, holidays, emergencies, and the like. Treatment staff and [correctional officers] on the unit will evaluate readiness for advancement through the plan. Violations (as determined/defined by the treatment team) will result in Farabee being stalled at a particular level, moving backward one or more levels, or moving back to the start of the plan – at the discretion of the treatment team.

Behaviors and Safety Matters Monitored for this SMHP:
Good housekeeping/cell cleanliness that meets routine standards at MCTC (e.g., appropriate use of toilet);
No Self-injurious behavior or threats of self-injurious behavior;
Meet DOC standards for grooming and hygiene (e.g., acceptable hair cut, showering 3 times a week);
Treat others with respect (including but not limited to asking rather than demanding, avoiding cursing/name-calling/yelling accepting rather than arguing with directives;
No new offender disciplinary actions (charges);
Cooperate with medical care (including but not limited to examination, wound care, vitals, weights)

Step 1: If behavior and mental status warrant, for a period no less than one week, Farabee will then be given his mattress during daytime hours (inspected [each] shift and each time he leaves cell in addition to unscheduled checks as specified above). If he is observed to be engaging in suspicious behavior with the mattress, he will not advance to Step 2.

Step 2: If behavior and mental status warrant, for another week, Farabee will then be given a flex pen to keep in his cell (only one at a time). If he is observed to use the pen in any way other than the manner in which it was intended (i.e., to write on paper), he will lose the pen and revert back to a previous level (possibly [suicide

precautions] depending on the nature of the misconduct with the pen, as determined by the LIP at that time).

Step 3: If behavior and mental status warrant, for a third week, Farabee will then be given personal property (beyond legal mail) to include up to 10 pages of loose paper, one book, and one magazine. He may request to swap his book, magazine, or loose paper for other items via the offender request form. If he is observed to engage in suspicious behavior with his personal property, he will lose it and revert back to a previous level of the plan, as determined by the treatment team.

Step 4: If behavior and mental status warrant, for an additional two weeks, Farabee will be reviewed by the team for termination of the SMHP.

If he is placed on [suicide precautions] at any time during this plan, the [suicide precautions] orders supercede this plan. Farabee will start again at Step 1 when [suicide precautions are] discontinued by the LIP.

(Docket Item No. 145-3.) Someone noted on the plan that Farabee refused to sign it.


On cross-examination, Farabee stated that he was 39 years old, had completed middle school and had received his General Equivalency Diploma, ("GED"), while housed at MCTC in 2006-2007. He said that he has received mental health treatment since he was 12 years old and has been prescribed numerous anti-psychotic medications in the past. Farabee conceded that he had so lengthy a history of self-injury that he could not even provide an estimate of the number of times he had harmed himself.

Farabee testified that he received a 20-year sentence with 16 years suspended in 2000 for a malicious wounding conviction. Farabee stated that he had been housed in numerous VDOC facilities, including being housed at MCTC on perhaps more than 10 separate occasions. Farabee stated that he stabbed himself in his stomach while being housed at Red Onion. Farabee testified that he was diagnosed with Methicillin-resistant Staphylococcus aureus, ("MRSA"), after being restrained in his own urine and feces and was transferred to Powhatan to receive medical care at the Medical College of Virginia. Farabee did admit that he had stuck a piece of concrete from his cell into his abdominal wound.

Farabee testified that, while incarcerated, he had cut himself with razors and metal pieces obtained from his cells. He admitted that he had received "several" disciplinary charges since arriving at MCTC on January 26, 2018. Farabee stated that he currently had eight lawsuits pending in various courts. He admitted that he had no knowledge that any adverse action had been taken in any of these cases because he had missed any court deadlines. He testified that his legal materials were returned to him two days before the hearing. He also agreed that he had been allowed to receive a certain number of pages of his legal materials at a time for the previous month.

Farabee denied that he had ever refused medical or mental health treatment other than refusing anti-psychotic medication or antibiotics.

Sandra Halsey, M.S.W., a VDOC Psychology Associate at MCTC, also testified. Halsey testified that MCTC offers acute psychiatric care for inmates who are involuntarily committed. Halsey said this acute care is a separate program from

-19-

the IDTP, which is an intensive treatment program for borderline personality
disorder. Halsey said that Dr. Haynes did offer DBT as part of the IDTP.

Halsey stated that, when an inmate is transferred to MCTC, he is placed in
Unit 1B in very restrictive housing. All offenders, she said, are admitted to MCTC
on suicide precautions on strip cell. Next, the inmate is moved to Unit 2B where he
can come out of his cell for an hour a day, Monday through Friday.

Halsey said that when Farabee arrived at MCTC in January 2018 he would
not contract for his safety and he would not participate in IDTP. Based on
Farabee's condition, Halsey said the treatment team sought, and received, a court
order involuntarily committing him into acute care. Halsey said that, in February
2018, a MITT met and determined that Farabee no longer needed acute care, and
he was discharged and recommended for placement back in the IDTP Unit, where
he could receive DBT.  Halsey said that Farabee refused to go to the IDTP Unit.
Near the end of February, the decision was made to move Farabee to the IDTP
Unit. Halsey said that Farabee was transferred into the IDTP Unit on a weekend.
She said that Farabee became upset when his DBT treatment did not begin
immediately, and he did not want to wait until the group sessions reconvened on
Monday. In response, Halsey said, Farabee defecated in his cell floor, began
yelling, opened up his abdominal wound and smeared blood on the walls of his
cell.

As a result, Halsey said, Farabee was placed back on suicide precautions by
the mental health staff. On that Monday morning, she said, the treatment team
sought, and received, another court order involuntarily committing Farabee to
acute care at MCTC. When Farabee came off suicide precautions on this occasion,

the treatment team put the current SMHP in place. Halsey said that Farabee had progressed through the plan and had been recommended to progress to the Segregation Release Program so that he could participate in anger management classes. Halsey said that Farabee was refusing to go to the Segregation Release Program, instead demanding to advance to direct placement in general population. Halsey testified that Farabee is currently classified as a security level "M" which is the equivalent of "S," or segregation, status. She said that Farabee could not be placed out of SRP into general population until his security status was reduced. As a mental health worker, she said that she did not have the authority to "override" Farabee's security status. She said that Farabee's most recent involuntary commitment order was effective for only 180 days. She said he could be removed from acute care by being discharged or simply because his committal order expired.

Halsey agreed that Farabee would not receive DBT while housed in acute care at MCTC. She said that acute care at MCTC was intended to be short-term stabilization care. She said that no one-on-one therapy of any kind was offered in acute care. She said acute care was not designed to offer any long-term therapy. She said that, when an offender's mental health condition improved, the treatment team would recommend the offender be discharged from acute care and would initiate the process to transfer the offender where he could receive ongoing mental health therapy.

Halsey testified that Farabee had been admitted to MCTC on six occasions in the previous couple of years with increasing frequency of self-injurious conduct. Halsey said that some of the self-injurious behavior by Farabee included swallowing a spoon and parts of a radio, inserting items in his bodily openings

including up his penis or rectum, using his teeth and fingernails to injure himself, using a screw from his cell toilet to injure himself, cutting himself with razor blades and packing his wounds with his own feces or pieces of concrete cement from his cells. Halsey said that Farabee had a history of "suitcasing" metal items used to injure himself by placing the items up his rectum for retrival later. Halsey denied that Farabee only injured himself while housed in segregation. In fact, she said that the last time Farabee injured himself by reopening his abdominal wound he was being housed in the IDTP Unit not in the segregation or restrictive housing unit.

Halsey testified that offenders who are involuntarily committed to MCTC are assessed on a monthly basis to determine if they continued to need acute care. She said that Farabee's treatment team had determined that his condition no longer merited acute psychiatric services. Halsey said that Farabee was being referred to the MITT to determine if he could receive mental health services in a less restrictive environment. Halsey said that, before Farabee would be accepted into the residential treatment program at MCTC, he would need to display a period of no disciplinary charges and no injuries to himself or others and be placed at a lower security level. Halsey said the residential treatment program at MCTC did not accept offenders at security level "M" or "S."

Halsey testified that Farabee had threatened her previously, although she could not recall any specific threat. Halsey stated that Farabee had not threatened her since his most recent SMHP was put in place on March 1, 2018. Halsey said that, since this plan went into effect, Farabee had advanced according to the plan, except for one week where he refused to discuss the plan or his status.

Halsey also testified that she believed that Farabee would pose a risk if placed in the residential treatment program because he had participated in predatory behavior in the past. When questioned what she meant by predatory behavior, Halsey said that Farabee once had attempted to persuade another offender to write a false allegation against staff, and, when the other offender refused, Farabee spat on the offender. She said that Farabee did receive a disciplinary charge in that incident. Halsey also stated that offenders housed near Farabee tended to obtain items and self-injure, but she admitted that Farabee had not been charged in any of these incidents. She said that many of these inmates had said that Farabee had encouraged them to injure themselves.

Halsey testified that she conducted rounds in all units of MCTC on Monday through Friday each week between the hours of 8 a.m. and 4:30 p.m. She stated that she purposefully conducted rounds at different times of the day in different units. She stated that when she entered a unit, she would sign in and then go around the unit and speak to each offender. She said that, although she stopped at each door to speak to each offender, she would not wake an offender to speak to him. She said that whether she had a conversation with any particular offender on any particular day depended on whether the inmate engaged her in conversation.

Halsey said that her interactions with Farabee were "driven by his mood at the moment." She said that sometimes Farabee would not even acknowledge that she was present at his door. On other occasions, she said that Farabee would yell vulgarities at her. Halsey stated that, if she had a concern based on her interaction with an offender during rounds, she would communicate that concern to the offender's treatment team members. She said that the treatment teams met twice a week to discuss the offenders they were treating.  Halsey also said that case worker

-23-

Campbell, Bolatch and Dr. Lee all did rounds in the units daily. She said the Warden, Assistant Warden and correctional captains also conducted rounds in each unit each day.

In rebuttal, Farabee testified that he had never engaged in any predatory act toward another offender. He specifically denied ever spitting on another inmate. He claimed that he had never used an item from his personal property to harm himself. He said that he had never hidden any items in his rectum. He claimed that Halsey was "completely making …up" evidence. He also claimed that when he arrived at MCTC in January 2018 he contracted for his safety.

Prior to the evidentiary hearing, the defendants filed an Affidavit from A. McGrady, Ph.D., the Chief Psychologist at MCTC, in opposition to Farabee's motion for preliminary injunctive relief. (Docket Item No. 117-1.) According to McGrady, Farabee arrived most recently at MCTC on January 25, 2018, with a self-inflicted open wound to his abdomen. McGrady stated that Farabee refused to consent to wound care and would not allow medical staff to examine the wound, and he threatened to pack the wound with feces to ensure an infection. McGrady stated that Farabee was on a hunger strike and was in "physically poor condition due to dehydration and poor nutrition." (Docket Item No. 117-1 at 2.) According to McGrady, Farabee was scheduled to be assigned to the IDTP program at MCTC when he arrived. Due to Farabee's condition, however, Dr. Lee and Farabee's treatment team determined that he was not suitable for IDTP because he met the criteria for involuntary commitment. She said that Farabee was involuntarily committed to MCTC for inpatient treatment by Order of the Smyth County General District Court, entered January 25, 2018.

According to McGrady, the IDTP is designed for offenders who have been classified as severely mentally ill and operates with structured security regulations and procedures, while providing programming and treatment services conducive with evidence-based treatment protocols and individualized treatment plans. McGrady said that the IDTP Unit at MCTC is a general population assignment in which offenders are expected to comply with program requirements. She said that offenders who are involuntarily committed are not housed in the IDTP wing at MCTC.

McGrady stated that, due to his history, Farabee, on arrival at MCTC, was assigned to acute care in the restrictive housing unit with a camera in his cell to monitor his behavior. McGrady said that restrictive housing is a special purposed bed assignment operated under maximum security regulations and procedures for the personal protection and welfare or custodial management of offenders. Restrictive housing is not a disciplinary measure, McGrady said. For self-injurious offenders, McGrady said, safety precautions are taken, in which safety blankets and smocks are provided, but property items which an offender could destroy, use as a weapon or use to harm himself are withheld. She also said that a management path is designed to meet each offender's behaviors and needs so that he can enter the general population. She said that an offender remains at this status until he agrees to stop hurting himself.

McGrady stated that Farabee was deemed ready to move from acute care in restrictive housing to the IDTP Unit at MCTC on February 6, 2018. McGrady said that, when staff attempted to move Farabee to the IDTP Unit on February 13, 2018, Farabee refused, and he was charged with Disobeying An Order to Return to General Population and Providing False Information to An Employee. On February

23, 2018, Farabee was moved to general population and placed on 15-minute watch. McGrady stated that Farabee was allowed access to his legal materials, but he was not allowed to have all of his legal paperwork in his cell at one time because, in the past, he had hidden objects used to harm himself among his papers. McGrady also said that Farabee was allowed to use a flex pen for legal mail purposes under the supervision of a treatment officer.

McGrady said that, on February 24, 2018, Farabee defecated in an outdoor recreation unit. The next day, she said, Farabee began telling other offenders that he would soon be back in restrictive housing. On the morning of February 26, 2018, she said that an officer saw bloody handprints on the walls of Farabee's cell and cell window and some blood on Farabee's face. She said that Farabee would not allow a nurse to check his wound. As a result, she said, that Farabee was moved back to restrictive housing with a camera in his cell. McGrady said that she was informed by the nursing staff that evening that Farabee had reopened his abdominal wound to about four inches long and about one centimeter wide with underlying tissue visible. She said that Farabee allowed the nursing staff to view the wound, but he would not allow any treatment. She said that Farabee threatened to open the wound further and place feces in it. McGrady said that she ordered that Farabee be placed in four-point restraints, and Farabee was monitored by medical staff every four hours throughout that night.

McGrady said that she met with Farabee the following day, February 27, 2018, and he refused to contract for his safety by agreeing not to self-injure. She said that Dr. Edson met with Farabee to assess his wound; however, Farabee refused to allow him to view the wound. She said that she continued Farabee on four-point restraints and planned to seek involuntary commitment on February 28,

2018. McGrady said that Farabee allowed wound care on February 28, 2018, and was released from four-point restraints around 12:30 p.m., prior to his commitment hearing, which he attended. McGrady said that Farabee was involuntarily committed on February 28 because he refused to comply with treatment by agreeing not to harm himself.

After the hearing, McGrady said, Farabee's treatment team discussed restrictions necessary to ensure Farabee's safety. She said that Farabee was placed on security precautions with 15-minute checks with a safety smock and safety blanket, rubber food tray and spoon with no rigid objects and the supervised use of a flex pen. McGrady said that the restrictions imposed upon Farabee were the same restrictions imposed upon any offender who self-injured. McGrady said that all VDOC offenders who are involuntarily committed for mental health treatment are housed at MCTC.

McGrady said that, in addition to daily monitoring and mental health care, Farabee was assessed by his treatment team every 30 days. She said that, when Farabee meets his treatment goals and becomes compliant with his treatment, he would be placed in general population programming where his restrictions would be gradually reduced, and he could earn the same privileges as other general population offenders.

## II. Analysis

"The law is well settled that federal injunctive relief is an extreme remedy." *Simmons v. Poe*, 47 F.3d 1370, 1382 (4th Cir. 1995). Furthermore, a preliminary injunction is considered "an extraordinary remedy involving the exercise of a very

far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3rd Cir. 1989)). The party seeking entry bears the burden to establish that these factors support granting a preliminary injunction: (1) the movant's likelihood of succeeding on the merits of the action; (2) the likelihood of irreparable harm to the movant if preliminary injunctive relief is denied; (3) that the balance of equities tips in the movant's favor; and (4) that an injunction is in the public interest. *See Di Biase v. SPX Corp.,* 872 F.3d 224, 230 (4th Cir. 2017) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

As stated above, the Motion before the court seeks the entry of preliminary injunctive relief preventing the defendants Dr. Lee, Robichaux-Watson and Madsen, from participating any further in Farabee's placement, treatment or care within the VDOC, ordering Farabee to be transferred to a facility that offers a Common Fare Diet, ordering the return of Farabee's personal property and ordering that he be released from segregation and placed in a general population prison setting. At his hearing, Farabee stated that he also was seeking preliminary injunctive relief ordering that he be released to the residential treatment unit at MCTC, that he receive DBT and that he have access to his legal materials.

Based on the evidence currently before the court, I find that Farabee has failed to establish that the entry of any preliminary injunctive relief is appropriate. First, the evidence before the court shows that Farabee has been given access to his legal materials and personal property. Second, Farabee does not have any claim before the court with regard to his inability to receive a Common Fare Diet. With regard to Farabee's other requests for injunctive relief, the evidence has not

persuaded the court that Farabee has a likelihood of success on the merits on any of his remaining claims. Farabee has three remaining claims -- one claim against all defendants based on denial of adequate mental health treatment and his conditions of confinement, a second claim against defendant Dr. Cary based on allegations of forced medication, conditions of confinement and unlawful seizure and a third claim against defendants Dr. Lee and MCTC Warden Robichaux-Watson based on conditions of confinement and retaliation.

The Eighth Amendment to the U.S. Constitution not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). This includes a requirement that a state provide medical care to those it punishes by incarceration. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Godfrey v. Russell*, 2015 WL 5657037, at *8 (W.D. Va. Sept. 24, 2015) (citing *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)); *Chapman v. Rhodes*, 434 F. Supp. 1007, 1020 (S.D. Ohio 1977), *aff'd*, 624 F.2d 1099 (6th Cir. 1980), *rev'd on other grounds*, 452 U.S. 337, 344 (1981). For a prisoner to prevail on a constitutional claim for denial of medical care, he must demonstrate that a defendant's acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle*, 429 U.S. at 106. In essence, treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted). To prevail on a claim of a violation of the Eighth Amendment based on conditions of confinement, a prisoner "must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471 (4th Cir. 1999) (quoting *Strickler v. Waters*,

-29-

989 F.2d 1375, 1379 (4th Cir. 1993)) (internal quotation marks omitted). To prevail on a § 1983 retaliation claim, an inmate must show "either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Bare allegations of retaliation do not establish a claim rising to the level of a constitutional nature. *See Adams*, 40 F.3d at 74-75. To prevail on a retaliation claim, a plaintiff must present specific evidence "establish[ing] that but for the retaliatory motive the complained of incident … would not have occurred." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).

With regard to a prisoner's medical treatment, a prison official is deliberately indifferent if he knows of, but disregards, an inmate's serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994). Liability under this standard requires two showings. First, the evidence must show that the prison official subjectively recognized a serious medical need. It is not sufficient that the official should have recognized it; the official must actually have known of it. *See Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. *See Farmer*, 511 U.S. at 832-35; *Sosebee v. Murphy*, 797 F.2d 179, 182-83 (4th Cir. 1986); *Loe v. Armistead*, 582 F.2d 1291, 1296-97 (4th Cir. 1978); *Rush v. Vandevander*, 2008 WL 495651, at *1 (W.D. Va. Feb. 21, 2008). Second, the evidence must show that the prison official subjectively recognized that his actions were "inappropriate in light of that risk." *Rich*, 129 F.3d at 340 n.2. It is insufficient that the official should have recognized that his actions were insufficient. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001).

-30-

The same is true regarding a claim of deliberate indifference to the dangers posed by a condition of confinement. To amount to deliberate indifference, a public official must have been personally aware of facts indicating a substantial risk of serious harm, and the official must have actually recognized the existence of such a risk. *See Farmer*, 511 U.S. at 837. "[D]eliberate indifference entails something more than mere negligence, … [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

Questions of medical judgment are not subject to judicial review. *See Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). A claim regarding a disagreement between an inmate and medical personnel over diagnosis or course of treatment and allegations of malpractice or negligence in treatment do not state cognizable constitutional claims under the Eighth Amendment. *See Miltier*, 896 F.2d at 851-52; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Estelle*, 429 U.S. at 105-06. An inmate is not entitled to unqualified access to health care; the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Jasper v. Mullins*, 2007 WL 3339605, at *2 (W.D. Va. Nov. 8, 2007) (quoting *Bowring*, 551 F.2d at 47-48). To establish liability under § 1983, a plaintiff must prove that the defendants "acted personally in the deprivation of the plaintiff's rights." *Wright*, 766 F.2d at 850. Therefore, it is insufficient to show that the prison system, generically, failed to provide adequate medical care to an inmate.

Turning to the facts of Farabee's claims, the court is persuaded that Farabee suffers from a serious medical need – a psychiatric condition which, although not clearly defined by the evidence before the court, appears to at least contribute to

his repeated attempts at self-harm. Nonetheless, the court is not persuaded that Farabee is likely to succeed on claims that his treatment and/or conditions of confinement at the hands of the defendants amounted to deliberate indifference, in that he has not persuaded the court that his mental health treatment or his conditions of confinement pose any objective substantial risk of serious harm or that any of the defendants subjectively know that they pose any such risk. It appears that Farabee's complaints revolve around his claim that he is being housed at MCTC in segregation housing on strip cell status without receiving his desired therapy in retaliation for the filing of this and other lawsuits. The evidence, however, persuades the court otherwise. The evidence before the court shows that, at the time of his hearing, Farabee was being held in the acute care unit at MCTC on an involuntary commitment order entered on February 28, 2018. Based on the evidence presented, the court is persuaded that this commitment order was sought and received because of Farabee's actions in reopening his abdominal wound. The court also is persuaded that the mental health staff at MCTC returned Farabee to strip cell status with suicide precautions based on this episode of self-harm. A move that appears completely appropriate under the circumstances that then existed. Since that time, Farabee's treatment team has put in place a Self-Management Housing Plan, under which Farabee's conditions of confinement have progressed, and may continue to progress, based on his improving mental health condition and a continuing lack of self-harm attempts. Also, his treatment team has recommended that he be discharged from acute care, and a MITT is being asked to consider whether it may be appropriate to provide mental health treatment for Farabee in a less restrictive setting.

It is important to note that Farabee has produced no expert psychiatric or psychological evidence to the court supporting his claim that his mental illness is

caused or exacerbated by being continually placed on segregation status with strip cell suicide precautions. While McWilliams's April 23, 2018, letter recommends that Farabee receive DBT for his borderline personality disorder, it does not address whether Farabee's conditions of confinement were causing him any harm. Halsey did not offer any such testimony, and McGrady's Affidavit contains no such evidence. It also is important to note that there is no evidence that any of the named defendants have been personally involved in Farabee's treatment decisions, other than Dr. Lee. Also, there is no evidence that any of the defendants, other than Dr. Lee and Warden Robichaux-Watson, have been personally involved in determining Farabee's conditions of confinement. Based on this evidence, Farabee has not persuaded the court that he has a likelihood of success on the merits of his claims based on his mental health treatment or his conditions of confinement.

Farabee also has not persuaded the court that he has a likelihood of success on the merits of his retaliation claim. Other than his own conjecture and speculation, Farabee has offered no evidence that Dr. Lee or Warden Robichaux-Watson has taken any action against him in retaliation for exercising his constitutional rights. As stated above, Farabee has presented little evidence that Warden Robichaux-Watson is responsible for his mental health treatment or the conditions of confinement about which he complains. In fact, the only evidence of any personal action by Warden Robichaux-Watson is that she approved ICA decisions designating Farabee for segregation in 2017 and, again, while housed at MCTC on this occasion. The court is persuaded that these actions were supported by the circumstances at the time. Insofar as Dr. Lee, as a member of Farabee's treatment team, has made decisions regarding Farabee's treatment and conditions of confinement, the court is persuaded that those decisions have been made to meet Farabee's continuing mental health issues and his self-injurious behavior.

With regard to the likelihood of irreparable harm if preliminary injunctive relief is denied, as stated above, Farabee has produced no expert psychiatric or psychological opinion that his current mental health treatment or conditions of confinement are causing, or will cause, him any injury. Based on all of the evidence before it, the court also cannot find that the balance of equities tips in Farabee's favor or that the entry of preliminary injunctive relief is in the public interest.

Based on the above-stated reasons, I recommend that the court deny Farabee's Motion.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.   Farabee has not persuaded the court that he has a likelihood of succeeding on the merits of his claims;
2.   Farabee has not persuaded the court that he faces the likelihood of irreparable harm if preliminary injunctive relief is denied;
3.   The court does not find that the balance of equities tips in Farabee's favor; and
4.   The court does not find that that an injunction is in the public interest.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court deny Farabee's Motion for preliminary injunctive relief.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Michael F. Urbanski, Chief United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: May 31, 2018.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE